It is a treat for the court to come here, to be around the students and faculty, to have an opportunity to engage and have some good oral arguments here as well. I certainly trust that the litigants have not found it any less enjoyable than we have. Before we get started, I want to note the presence in the courtroom of the former Chief Judge of Mississippi Court of Appeals, Roger McMillan. Welcome. I think his granddaughter may be in the courtroom as well, I'm not positive. So, we have four cases to hear today. We'll take a break at some point, I would imagine. First case of the day, Immarsat Global v. SpeedCast Intl. Mr. Colton. Thank you, Your Honor. May it please the court. Shortfall amounts owed by SpeedCast on the terms of the party's strategic alliance agreement are permitted claims within the termination agreement and outside of the scope of the party's 2020 mutual release. As part of their 2020 termination agreements, the parties did execute a mutual release, but they accepted or they didn't include in that release any claims for payment for services delivered, I'm going to paraphrase, under and otherwise on the terms of any existing agreement for the period between the filing of the petition and the approval of the agreement, about an eight-month period. SpeedCast continued to buy Immarsat's Fleet Express services during that eight-month period, and it admits that it got the benefit of the 30% discount applicable to those sales, but it contends it doesn't owe anything more under the terms of the agreement and need not pay corresponding shortfall amounts that were explicitly provided in exchange for that 30% discount. But that shortfall amount was as much a term of the services delivered under the existing agreement as the 30% discount. I'd like to start, though, after that briefing trail. I'd like to start by noting that this is a case where the briefing has kind of narrowed the issues, I think. Let's start with what has always been the case. The parties have always agreed that both the master service agreements, which were the big agreements that the parties agreed that the services were provided under because it settled generally the terms, and the strategic alliance agreements which set the price terms and other terms of these specific sales. The parties agreed that those are existing agreements as defined by the termination agreement. Now, critically, though, in this briefing, in this court, Speedcast now concedes, and it does so repeatedly at page 12 and 22 of its briefs, that it's undisputed that Speedcast must pay for services in Marsette delivered under a master services agreement, but on the terms of the strategic alliance agreement. Recall that the strategic alliance agreement simply supplemented or amended the terms of these particular sales, setting a 30% discount and this related payment obligation. So that concession really narrows this dispute because it blows up the district court's reasoning. It blows up the bankruptcy court's reasoning. The district court added a reason that the bankruptcy court hadn't, correct? That's correct. And I'll come to it. Well, maybe come to it right now. Okay. It is a little not intuitive to think that you would be owed money, a little over $2 million, for a service that was never delivered. If they owed you guaranteed RGU units, but those boats were never delivered, it's hard to think that there was a service delivered for which they owed money. Well, so I want to walk through the agreement as to why that is the case. Now, which agreement? The master service? Now we're talking about the strategic alliance agreement. Paragraph 2.2 of the strategic alliance agreement explicitly says that the SAA sets special pricing and terms for a five-year incentive plan detailed in Schedule A of the agreement and to leave no doubts, as in parentheses, FXGX pricing and alignment. That's what it's talking about there. So by its own terms, the SAA sets the terms of the sales under the MSA. And remember, going back to the language of the termination agreement, with the release, the permitted clause definition, it is under and otherwise on the terms of an existing agreement. So the deliveries here, there were eight months of sales under, as a matter of fact, when the termination agreement was entered into. But I'm just going to ask you to come right back to my question. What was the service delivered? If they never provided those units. The service delivered were the sales of all of the FXGX services during the eight-month period because a condition of those sales, the sales that did occur, right, a condition, a part of those sales, had two aspects to it. We'll give you a 30% discount, but in exchange for. Paragraph, the pricing principles in Schedule A of the agreement, right, the pricing principles in Schedule A said, say, in exchange for your guaranteed commitment. But the language, you know it, I'm sure, better than I do. The SAA also says that the revised minimum LGU commitments are provided for the compensation if SpeedCast doesn't meet the requirements. Inmarsat shall invoice SpeedCast for any ship shortfall. That sounds like a penalty if they breach. It's plainly not a penalty. It's alternative avenues of performance. There are two alternative avenues of performance here. One, you can buy the 1,400 units. And remember, the RG units are not simply the terminals. They are terminals that are the primary. This is the definition of RGU units in the SAA. They are terminals that are the primary communication link on the ship and have a subscription to it. So those are, it's the service. You're selling the service. The satellite FX service, which I think of as sort of like GPS in a car. That's right. You wholesale it, and then they start reselling it. Or your phone service, right. And in the retail, they're going to get a discount if they give you more cars, boats, fewer boats. But then they don't. And then you've built in a penalty provision. It didn't say penalty. It also doesn't say it's a take-or-pay arrangement. It just looks like the language. It's the second avenue of performance. Okay. Right? You can buy your 1,400, or you can come up short and pay an additional part of the price. If you fail to deliver. So it sounds like a failure. Just simplistically, it sounds like they failed to deliver a service, the boats. It was sort of, you're right, the asset transfer. You know the logic. Judge Rosenfeld spelled it out. Sure, but you can't take one without the other. Okay. That is your argument. That is our argument. It is an ancillary part of the price. It is ancillary to the 30%. You can't have the 30% discount if you're not willing to. We're not going to sell to you if you're not willing to deliver these units and pay whatever shortfall amount. But if you fail, we're going to get our money back anyway. Well, if you fail, the price is different. That's the answer. If you fail, it's 30% plus. It's 30% plus that supplemental payment. That supplemental payment is still a payment under the language of the Terminator. For past services? For the services during the eight-month period. For all of the services delivered during that eight-month period. Yeah, I understand the argument. It's an ancillary part. By the way, my questioning is only something that the district court adopted, right? The bankruptcy court didn't adopt this. Bankruptcy court didn't reach this. So you may want to back up and get to that, or you do what you want. No, look, the bankruptcy court's rationale is blown up by the concession. My point on that concession is that the bankruptcy court says, well, these deliveries were only under the MSA, the Master Services Agreement, and since it was only under the MSA and this shortfall amount is due under the SSA, you can't get that. Well, my adversaries here have conceded that we agree with you that it can be under one agreement and on the terms of the other agreement. Well, factor in the termination agreement because, you know, SpeedCast filed for Chapter 11 late April of 2020. This termination agreement was confected in November of 2020, effective 1 January 2021, and the termination agreement, just by its title, was trying to wrap things up between Inmarsat and SpeedCast, which had taken Chapter 11. And it seems that the language there, that they are liable only for, going forward, services rendered by Inmarsat, if I'm pronouncing it right, that's a pretty big hurdle for you to jump over. Well, it wrapped up things going forward, you're correct, after the effective date of the agreement. There is language in the termination agreement about claims by Inmarsat. It doesn't say going forward, it just says claims by Inmarsat. Quote that passage to us. You're talking about the actual release language. Yes. Well, the release language is preferenced. I'm talking about the termination agreement, the provision in the termination agreement. The language that I've been relying on. Yes. This is any claims for payment for services delivered by the Inmarsat entity during the relevant eight-month period. And state the dates of the eight-month period. April 23rd, 2020 to January 1st, 2021, which is when the agreement was effective. So on the effective date, everything afterwards was released. We're talking about getting what we bargained for. Why would you have a termination agreement if you're going to get a certain class going forward but you want what they owe you in the past? That just doesn't make sense. They're in Chapter 11. Because we're giving the 30% discount. They've got the benefit of the 30% discount that was in exchange for that payment. They're now in Chapter 11 when you agree to this termination agreement. It just, on a very basic level, it doesn't make sense that you would claim they owe you for this when the termination agreement was confected and not more specific than it was. Well, again, the termination agreement, the very definition of a release in the termination agreement. You don't need to define release to me, counsel. No, no, in the termination agreement, Your Honor. Even before you get to the release, it says other than permitted claims. So it's not even an exception. It's just that these claims were outside the scope of the release from the beginning. But permitted claims is all we're dealing with, isn't it? That's right. This is a question of whether this is. So it's got to be a service rendered by NMARSET to SpeedCast. Yes, which we did. We rendered those services during the relevant period. And this is, again, this is a part of the price. It's ancillary to the price. Mr. Kauffman, let me take this same point but in a slightly different direction perhaps. The need of termination, I guess, is the title parties put to it, something like that, is negotiated over some period of time. Bankruptcy, date of bankruptcy, I guess, is the April 23, 2020. This is not executed until November. It's looking forward to only, what, six weeks or so until the end of the period of the deed of termination and signing all the agreements that existed with SpeedCast. It seems to me, and I don't know if we're entering into the field of ambiguity, which, of course, Judge Rosenthal dealt with as well, but it does seem to me looking at this deed of termination, one way to read it, and the use of the word deliveries, I understand, even though you want to make sure we do, I understand your point about when you pay for deliveries, when there's a shortfall, the payment includes the shortfall amount. So that is there, and that's part of your earlier strategic alliance agreement. But it does seem to me one way to read what's going on at the deed of termination is wrapping it up, ending all obligations after December 31, January 1, whatever it is, and also saying after the date of bankruptcy, April 23, the only payments are going to be for actual deliveries. I know you don't buy that, and you have the argument that you've already made, but it does seem to me that is a fair way, a reasonable way, you would say only if you don't understand the big picture, but nonetheless, a fair way to read what this deed of termination is saying. I do think ambiguity enters into this. Let's say we go awry and look at ambiguity. What do you say to that? What is in the record that would relate to ambiguity, and why doesn't that support what Judge Rosenthal did? Well, what Judge Rosenthal said about ambiguity is that he made actually a mistaken conclusion that when the release happened on January 1, what Judge Rosenthal thought was that we had taken the customers during the eight-month period, and so as a result, he said, well, why would they still have a shortfall amount if you took all the customers? The customers actually weren't transferred until the January 1 date. So his conclusion on that was incorrect, and he also— I imagine you didn't appear at any hearing in front of Judge Rosenthal. No, I did not. Judge Rosenthal is a woman. I knew that, Your Honor. I'm sorry. My apologies. Finish your answer. I was thinking of the other judge. My apologies. I hope we didn't send you too off track. No, no, no, no. If you've got to make a mistake, my name is Shannon, Your Honor. I've spent my whole life being called Ms. Coffin, so— Well, you may know my first name as well. Exactly. I appreciate the problem. Your Honor, it has to—it's a requirement of being a DAG for the civil division, apparently. But at any rate, Your Honor, the other thing he said was— and Speedcast has said this, but when you look at the release, it's really not fair. It's just not fair because we've been paid already. We got paid a whole bunch of money. I'm sorry. We got paid a whole bunch of customers as part of this deal. But the asset sales agreement didn't make the release. The mutual release here was not consideration for that transfer. If you look at the asset sales agreement, the asset sales agreement lists the consideration. We paid. We paid for those customers. We gave cash consideration for those customers. The release was just consideration for itself. Now, I'm not suggesting it's without consideration. I'm just suggesting we didn't get some major windfall here. Thank you. Thank you, Your Honor. Good morning, Your Honors. The district court correctly rejected Inmarsat's attempt to recover on a claim that had already been paid to release. As part of a settlement agreement and in exchange for valuable consideration, Inmarsat agreed to an exceedingly broad release of any and all claims it had against Speedcast with a narrow exception. That exception for permitted claims was limited to claims for payment for services delivered by Inmarsat to Speedcast under and otherwise on the terms of certain prior agreements among the parties. Have you conceded that both agreements, the Strategic Alliance and the MSA, are both involved here, as your friend on the other side was saying in his argument? Yes, Your Honor. The termination agreement is clear that Inmarsat gets paid for services it actually delivered, and it has been, and at the price set in the SAA, the Strategic Alliance Agreement, and it has been paid for those claims. The claim for a shortfall amount, which is what's at issue here, is not a permitted claim. The shortfall amount is a claim to enforce a penalty, a contractual penalty, for customers Speedcast failed to refer for its failure. I do think that Mr. Coffman has a fair argument. That's part of the payment for deliverance, and it was set up. And you need some clarity in the de-determination, it seems to me, because that was part of the payment. I mean, it's a matter of semantics. You can call it a penalty or whatever else, but it does seem to be part of the computation. Whatever your shortfall is, here's how we compute what you have to pay. So, I mean, I know what your briefing says about that. I mean, I'm just trying to figure out under two plausible interpretations. I'm not saying ambiguity yet, but why isn't that a fairly reasonable interpretation that that's part of the payment, the shortfall? Yeah, Your Honor, I think you start first with the release in the termination agreement, which is very broad. And so it releases any and all claims subject except for permitted claims. Which puts you right at the problem. Right, so where I'm going, Your Honor, is permitted claims doesn't say any and all claims under the SAA. It's very specific. It says claims for payment for services delivered by Inmarsat. And you don't know about the shortfall until you know what services have been delivered. Well, that's correct, Your Honor, but they're inversely proportional, right? So the fewer services delivered under the agreement, the fewer services Inmarsat actually delivers, the greater the shortfall amount. So it's clear from the illustration there, right, that the shortfall amount covers the gap for what was not performed, for what the services BCAS did not initiate and what Inmarsat did not provide. What is in the record? You may not be taking this position, so let me start there. If you are taking the position, what is in the record? That the shortfall is the reason for this dedetermination. The shortfall is the reason maybe even for bankruptcy, but we don't have to go that far. It's the reason for the dedetermination. Sure, Your Honor. There's several places. I'd first direct you to the motion to approve the transaction that's at 257, 258, and 263 in the record. And there it's very clear that they say retaining the business, retaining SpeedCats resale business would impose a burden with an estimated negative impact of $53 million for fiscal 2020 to 2023. So that covers the 2020 period. What's the fiscal year involved here? It's the same as the calendar year. So all of 2020 is included in that range? That's correct, Your Honor. And the sellers, the debtors here, do not anticipate such targets being met. The premise of the negotiations really started, and I'm quoting now from 258, in June 2020, following continued difficulties in meeting various performance targets and acquiring new customers, the parties began figuring out how to restructure their relationship. If you look at 263, for example, in more sense, it says it expressly agreed to allow the debtors to continue providing services on 600 vessels. The obligation under the commitment was 1450. So it's clear the parties understood that SpeedCats wasn't going to be able to make its commitment, and this is during 2020. And so that was part of the impetus for the transaction. That can go on. There's a declaration that supports the motion. And remember, this motion wasn't opposed. It was actually consented to by Inmarsat. That's at 403. There's a declaration. And so that's one set of documents. There's a whole set of documents about the transaction itself. Now, I know we don't even need to get here if you find that the contract is unambiguous, which I think you should. You have disclaimed the logic that the district, the Bankruptcy Court relied on. Is that correct? I disagree with that, Your Honor. I think if you look at the Bankruptcy Court's decision, and in particular at 678 in the record, what the court is saying essentially there is that no services were delivered under the SAA. And we agree with that, Your Honor. No services were delivered under the SAA. And I think that's a concession. I mean, that's an agreement. There's no dispute about that. Just talk about the point where the judge says they delivered the services under the MSA, did not deliver under the strategic. Right. And I think, Your Honor, if you understand, right, that only the services that were actually delivered were delivered under the MSA. And the obligation here that Inmarsat is trying to enforce, the commitment, the commitment only arises under the SAA. But the prepositional and the conjunction argument. I don't think you need to reach that issue, Your Honor. You're just saying there is a sort of premise there that was then elaborated on by Judge Rosenfeld. That's your primary argument. That's correct, Your Honor. But when Judge Rosenfeld did a third step, which was to say, well, even if it's ambiguous, we'll look at extrinsic evidence so we can conclude. Would you agree that since she's not the trier of fact, we would have to remand, and that would have to be remanded to the Bankruptcy Court? If we go with the route of ambiguity, she isn't the one under New York law that can make those determinations a fact. Is that correct? Your Honor, I don't think you need to get there for a couple of reasons. I know you do, right. And I understand that. But if we are looking at this as a point of ambiguity, would it have to be done in the first instance by Judge Isker? Well, actually, Your Honor, too, is the Renaissance Hospital case, which was cited in our briefs. And I think the court there faced a similar situation here where the Bankruptcy Court made certain findings or failed to make certain findings, let's say. And the District Court actually reversed the Bankruptcy Court and noted that the Bankruptcy Court had not made those findings. But nonetheless, this court affirmed. And the reason it said so was basically the evidence here that would need to find to make those factual determinations is very clear on the record that's before you. So I think it's sort of used as an aid of construction here, and that's the way I would sort of think about it. I think there's nothing in the record that points in the other direction in terms of what the parties intended here. The evidence is so one-sided, so to speak, with respect to what the parties intended in the transaction, that it's not necessary for this court to have to remand to reach that. I don't think you need to get there. The standard of review where we have to start in every case, this case was decided by the Bankruptcy Court, appealed to and then affirmed by the District Court, different reasoning in part. So as Judge Higginson is saying, we've got to decide because we review the Bankruptcy Court opinion, issues of law de novo, finding the fact a clear error. The District Court opinion, in a general sense, is more of whether it's persuasive or not. So address how we, if in effect this court were to agree with Judge Rosenthal on the District Court, how we do that without remanding to the Bankruptcy Court. Yeah, I understand. I think it's de novo review of what Judge Rosenthal did, and so I think there's sort of three steps. Number one, our view, of course, is that the contract's not ambiguous, so you don't need to get to intrinsic evidence whatsoever. He thinks the same thing, though. He does, Your Honor. But there's lots of law, of course, that says even if parties agree. But he's saying y'all reached a concession that would sort of wipe out the rationale of the Bankruptcy Court. I understand that, Your Honor. I disagree with that for the reasons that we've went through, but I also think it doesn't matter because it's de novo review. I think your review of the District Court is also de novo. Yes, it is de novo, but findings of fact. No, I understand your point, Your Honor. I think it's something we're going to have to deal with. I understand your point. I would say that I don't think Judge Iskar made findings of fact here, so I don't think that that issue is a problem. I would agree that this is de novo review sort of all the way through. What about the sort of fundamental issue here, which is that they only negotiated the discounted price subject to your getting them more boats, and therefore for the eight months where they were giving you services, the satellite services, those prices didn't reflect what they would have charged had you provided the extra RGU units. That way they're integrated and it's not a penalty. I understand that that's their argument. I think the way to think about it is that the promise to secure X number of customers is a separate promise from the promise to deliver services to begin with, and that was a promise that SpeedCast made, and the contract provides what the remedy is for that promise, and the remedy for that promise is the shortfall amount. It's not an increase in price. The price is constant in the contract. No matter how many services Inmarsat delivers or doesn't deliver, it's always 70 percent of the standard pricing. That doesn't change. There's a separate promise that was offered to secure X number of customers, and there is an enforcement mechanism in the contract to make up that shortfall, and that's what they're trying to enforce here. They're not trying to enforce the 70 percent. We've already paid that. What they're trying to enforce is the separate promise to secure 1,450 customers. So it's a penalty provision. Yes, Your Honor. I think it's a penalty. It's liquidated damages. And yet it wasn't called that, so would it be an ambiguity that it's a little hard to understand if services delivered could mean this? I don't think it's an ambiguity because it's precisely for services that aren't provided, right? So I don't think it's an ambiguity whatsoever in that respect. And, again, it's a term of the SAA. That's certainly clear. But the permitted claims definition doesn't include all terms of the SAA. It includes only claims for payment for services delivered, and that was what was released here. And I think just to address one other – I'm just thinking hypothetically. It's dangerous when I do this up here without having thought it first. But let's say the arrangement in the SAA had been, all right, you get the next eight months free, but we need a lot of boats. And then they give you eight months of satellite service, but you don't meet any of your targets. You'd still be saying they hadn't delivered anything? Well, they would have provided services in that respect. And those were paid for. But the agreement that the parties had with those would be free, it sounds like, right? So I'm not sure there would be a claim for payment for those services. I think the other way to think about it, again, is that – They were adamant, at least in their reply brief footnote, that this is not a zero customer deal. Right. Well, I think – and I think if you look at the footnote in the reply brief, I think there's a little bit of a sleight of hand that's going on there, right? Because we're not saying that the price is zero. The price is 70%. It is what it is. There's just no – they just wouldn't have delivered any services. So they don't have a claim to raise here in the bankruptcy. To just one other thing that sort of came up in the argument, the sense of whether it was fair or not for them to sort of take the bitter with the sweet, right? Or to excise the bitter of the shortfall payment but still accept the discount. I think there's two things that are important to stress there. Number one, this is all part of a global settlement, right, in a bankruptcy, Your Honor, where there was consideration paid in exchange for these releases. And if you look at Record 624, for example, which is the party stipulation, they talk about this as a global settlement in which the customers – I think 700 customer contracts installed inventory, which was the equipment on the boats that belonged to SpeedCast was transferred to Inmarsat. There was – all of SpeedCast receivables were transferred to Inmarsat. There was a mutual release, so SpeedCast gave up its own claims against Inmarsat. All of that was part of what went in here. So it was a rewriting of the party's deal, so to speak, insofar as there was an exchange. And the other thing to look at too – and this is also at 623 in the stipulation – is that the parties understood that the discount also inured to Inmarsat's benefit. It made it easier for SpeedCast to recruit customers because the prices were lower and they could attract more business. So it's not necessary – it's not the case that this is sort of unfairness in any way on SpeedCast's part. It's enforcing a release and a payment that Inmarsat had already agreed to make.  Thank you. Well, it sounds to me as if the court understands both parties' general positions. The notion that – I just heard at the end of this that this inured to the benefit of Inmarsat, that we were giving a 30% discount to attract more customers. Yeah, but we set a target that the whole point of this was to attract a specific number of new deal – new price plans, new terminals with price plans. And so, yes, we were willing to go to 30% because we were trying to align our interests. But aligning our interests also meant selling – we thought we needed to achieve in order for that deal to make sense. And our point here is that this is simply taking away the bidder and leaving only the suite. On the concession, I think it's just a very hopeful reading of the district court's opinion to suggest the district court wasn't dealing with this one agreement translation of interpretation of the permitted clause claims because the speedcast focused on a sentence that right before – the court says because the services were delivered solely under the SAA, we don't – I don't have to worry about those. But that was predicated by a sentence right before where the court said the services were delivered here under the MSA. And so what the court was saying is if you deliver under the MSA, the SAA is irrelevant. And so the concession here by saying there can be deliveries under the MSA and on the terms of the SAA, that blows up both the bankruptcy court and the district court's primary reason. So you're left with the core issue from the district court but not the bankruptcy court, which is what are these payments. And I think – I'm not going to bore you with my restating our position on that. We believe it's part of the price of all of the services that were delivered. It's part – as much a part of the terms of – and that's the language under the permitted clause. It's much a part of the terms of the existing agreement as the 30 percent, and we wouldn't have made this deal without getting this part of the payment. So we believe it falls comfortably within the language of the clause. And on that, Your Honor, if you have no more questions, I'm happy to cede the podium and apologize on the record to the district court. I've already texted Judge Rosenberg. She'll be talking to him. Thank you, Your Honor. All right. Thank you all to the students here. You can see how contract interpretation can be fascinating.